# Semiannual Report to Congress

**October 1, 2007-March 31, 2008**
**Office of the Inspector General**

<hr />

# Federal Bureau of Prisons



The BOP operates a nationwide system of prisons and detention facilities to incarcerate individuals imprisoned for federal crimes and detain those awaiting trial or sentencing in federal court. The BOP has approximately 36,000 employees and operates 114 institutions, 6 regional offices, and 2 staff training centers. The BOP is responsible for the custody and care of approximately 201,000 federal offenders, 166,100 of whom are confined in BOP-operated correctional institutions and detention centers. The remainder are confined in facilities operated by state or local governments or in privately operated facilities.

## Reports Issued

### The BOP's Efforts to Manage Inmate Health Care Costs

The BOP is responsible for delivering health care to federal inmates in its 114 institutions. From FYs 2000 through 2007, the BOP spent about $4.7 billion for inmate health care. In our review of the growth of inmate health care costs over the past 7 years, we found that the BOP has kept this growth at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor. The BOP has implemented cost containment strategies over the past several years to provide health care in a more effective and efficient manner. However, it generally does not maintain analytical data to assess the impact that individual initiatives have had on health care costs.

Our review also found that, with respect to inmate health care, BOP institutions did not always provide recommended preventive medical services to inmates. In addition, our audit determined that BOP institutions did not consistently provide inmates with the medical services recommended by BOP guidelines, which could lead to exacerbation of inmate medical conditions, higher costs for health care, medical-related complaints and lawsuits from inmates, and BOP liability for lack of adequate medical care.

In addition, we found that the BOP allowed some health care providers to practice medicine without valid authorizations, which increases the risk that they may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. We also calculated that 48 percent of BOP health care providers did not have their practices peer-reviewed to ensure the quality of their medical care, as required by BOP policy.

Prior OIG audits of BOP medical contracts identified contract-administration deficiencies in the BOP's review of health care costs, such as inadequate review and verification of contractor invoices and inadequate supporting documentation for billings. Subsequent to these audits, the BOP took action to address individual deficiencies at the institutions audited. However, our current audit found that other BOP institutions still lacked appropriate controls in these areas, which indicates the existence of systemic weaknesses that are not being addressed by the BOP.

The BOP monitors its health care providers by performing program reviews of institution operations, reviewing medical provider skills and qualifications, and providing authorization documents based on the review results. Institutions also are required to accumulate and submit data on health-related performance measures to BOP headquarters. We determined that the BOP's methods to accumulate and report health-related performance measures were

Exhibit A - Page 1 of 4

inconsistent, and that the data was not analyzed to evaluate the performance of BOP institutions. While the BOP has corrected deficiencies at the specific institutions where its program reviews found weaknesses, it did not develop and issue guidance to correct systemic deficiencies found during the reviews.

The OIG made 11 recommendations regarding the provision of inmate health care, and the BOP agreed with all of the recommendations.

## Investigations

During this reporting period, the OIG received 2,680 complaints involving the BOP. The most common allegations made against BOP employees included official misconduct and force, abuse, and rights violations. The vast majority of complaints dealt with non-criminal issues that the OIG referred to the BOP's Office of Internal Affairs for review.

At the close of the reporting period, the OIG had 249 open cases of alleged misconduct against BOP employees. The criminal investigations covered a wide range of allegations, including bribery, introduction of contraband, and sexual abuse. The following are examples of cases involving the BOP that the OIG's Investigations Division handled during this reporting period:

- In our September 2007 *Semiannual Report to Congress*, we reported on an investigation conducted by the OIG's New York Field Office that led to the arrest of 11 BOP correctional officers charged with violating the civil rights of inmates at the Metropolitan Detention Center in Brooklyn, New York. In the first incident in November 2002, five correctional officers participated in a planned beating of an inmate and then attempted to disguise the attack by planting a noose in the inmate's cell and claiming in written reports that the inmate became combative as they attempted to prevent him from committing suicide. A second incident occurred in April 2006 where five correctional officers, including one who participated in the previously described attack, physically assaulted a different inmate in an elevator while escorting him to a special housing unit within the facility. These five correctional officers and two additional officers were charged with writing false reports concerning this incident. During this reporting period, a BOP captain, BOP lieutenant, and three additional correctional officers were convicted in the Eastern District of New York on charges of conspiracy to violate the civil rights of an inmate, obstruction of justice, and making false statements. Five additional correctional officers pled guilty to similar charges and one correctional officer was acquitted. The BOP lieutenant was sentenced to 2 years' incarceration followed by 3 years' supervised release. One of the correctional officers was sentenced to 4 months' incarceration followed by 6 months' home confinement and 3 years' supervised release. Sentencing is pending for the other eight defendants.

- An investigation by the OIG's Dallas Field Office led to the arrest and guilty plea of a BOP chaplain for sexual abuse of a ward. Our investigation determined that on multiple occasions the chaplain, a Catholic priest, engaged in sexual acts with inmates who attended his Bible study class or who served as a clerk for the Religious Services Department at the prison. During an OIG interview, the chaplain admitted to multiple sexual acts with multiple victims and subsequently resigned his position with the BOP. Sentencing is pending.

- An investigation by the OIG's Atlanta Area Office led to the arrest and guilty plea of a BOP correctional officer on charges of bribery. OIG investigators determined that the correctional officer introduced marijuana and tobacco products into the prison for numerous inmates in exchange for money. Western Union records revealed that the correctional officer received at least 26 wire transfer payments from inmate family members or associates totaling more than $22,000. In an OIG interview, the correctional officer admitted to receiving $20,000 to $30,000 over an 18-month period for introducing contraband into the prison. The correctional officer resigned his position immediately following the interview. He was sentenced in the Northern District of Georgia

Exhibit A - Page 2 of 4

to 1 year incarceration followed by 3 years' supervised released, and he was ordered to perform 120 hours of community service.

- An investigation by the OIG's Atlanta Area Office led to the arrest and guilty plea of a BOP correctional officer on charges of bribery and smuggling contraband into a federal prison. OIG investigators developed evidence that on several occasions the correctional officer provided inmates with cigarettes in exchange for money. The correctional officer was sentenced to 25 months' incarceration followed by 2 years' supervised release and was ordered to pay a $1,500 fine. The correctional officer resigned his position with the BOP as a result of our investigation.

- A joint investigation by the OIG's Denver Field Office and the Department of Homeland Security (DHS) Bureau of Immigration and Customs Enforcement led to the arrest of a BOP warehouse supervisor on federal charges of transportation of child pornography. The investigation determined that the warehouse supervisor possessed and transmitted child pornography through his personal computer to servers located in France. Judicial proceedings continue.

- A joint investigation by the OIG's Miami Field Office, FBI, Florida Department of Law Enforcement, and Department of Health and Human Services OIG led to the arrest and guilty plea of a BOP physician and physician's assistant and three civilians on charges of conspiracy to commit healthcare fraud. The investigation uncovered a scheme in which the five defendants established a medical clinic that was used to defraud the Medicare program by billing Medicare for HIV infusion therapy treatment that it was not providing. The clinic received approximately $2 million in fraudulent Medicare proceeds. The BOP physician was sentenced to 2 years' incarceration followed by 3 years' supervised release, fined $10,000, and ordered to perform community service. The BOP physician's assistant was sentenced to 20 months' incarceration followed by 24 months' supervised release. Two of the civilians were sentenced to 24 and 30 months' incarceration, respectively, followed by 24 months' supervised release. The four defendants also were ordered to pay more than $1.8 million in restitution. Sentencing is pending for the third civilian. The physician and physician's assistant resigned from the BOP as a result of our investigation.

- A joint investigation by the OIG's Fraud Detection Office, Defense Criminal Investigative Service, U.S. Army Criminal Investigation Division, and U.S. Air Force Office of Special Investigations led to an agreement by Sioux Manufacturing Corporation (SMC) of Ft. Totten, North Dakota, to pay $2 million to settle allegations that it knowingly provided substandard woven Kevlar cloth for use in military combat helmets. Investigators determined that from approximately 1994 to 2006 SMC sold finished armored cloth (Kevlar) to Federal Prison Industries, Inc. (UNICOR), which used the Kevlar to manufacture Personnel Armor System Ground Troops helmets and sold the helmets to the Defense Logistics Agency. With each delivery of the Kevlar, SMC certified to UNICOR that its product met the required military specifications, one of which dictates a specific number of woven yarns per square inch of finished cloth. However, investigators found evidence that SMC sometimes delivered cloth that had not been woven to the required specifications. The helmets containing cloth woven by SMC passed all ballistics safety tests conducted pursuant to government contracts and similar tests conducted by the military during this investigation. Two former SMC employees filed the original lawsuit against the corporation under the qui tam or whistleblower provisions of the *False Claims Act*. The settlement was coordinated by the USAO for the District of North Dakota with the assistance of the Civil Division's Commercial Litigation Branch.

- In our September 2006 *Semiannual Report to Congress*, we reported on a joint investigation by the OIG's Houston Area Office and the DHS OIG that led to the arrest of a senior BOP correctional officer on charges of theft of public funds and wire fraud. The investigation disclosed that the correctional officer falsely claimed to be a victim of Hurricane Katrina and received more than $33,000 in benefits from the Federal Emergency Management Agency (FEMA), Red Cross, and other organizations. During this

Exhibit A - Page 3 of 4

reporting period, the senior correctional officer was sentenced in the Western District of Louisiana to 16 months' incarceration followed by 3 years' supervised release pursuant to his jury-trial conviction on charges of theft of public money, wire fraud, and making false statements. In addition, he was ordered to pay FEMA $22,540 in restitution, pay a $1,000 fine, and perform 100 hours of community service.

- An investigation by the OIG's Houston Area Office led to the arrest and conviction of a BOP correctional officer on charges of bribery. OIG investigators determined that on four occasions the correctional officer accepted bribes totaling $3,600 from an inmate in exchange for smuggling tobacco into the Federal Correction Institution. Sentencing is pending.

- An investigation by the OIG's Washington Field Office led to the arrest of a senior BOP correctional officer on charges of deprivation of rights under the color of law and making a false statement. Investigators determined that the senior correctional officer assaulted two inmates by closing a steel food-tray door on their arms and provided a false statement about the incidents to the OIG. Judicial proceedings continue.

## Ongoing Work

### The BOP's Administration of the Witness Security Program

The Witness Security Program (WITSEC) provides protection to federal witnesses and their family members. The OIG previously examined the USMS's and the Criminal Division's roles in the WITSEC program. Our third audit in this series is assessing the BOP's role in WITSEC, including the BOP's security for WITSEC prisoners in its custody.

### Review of Health and Safety Issues at BOP Computer Recycling Facilities

The OIG is investigating whether the BOP adequately addressed allegations that workers and inmates at several BOP institutions were exposed to unsafe levels of lead, cadmium, and other hazardous materials in computer recycling plants operated by UNICOR.