*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

# Health Care in the Federal Bureau of Prisons: Fact or Fiction

Daniel S. Murphy

*Appalachian State University*

## Abstract

Having spent five years imprisoned in Federal Medical Centers (FMC), I have substantive experience with the health care delivery system of the Federal Bureau of Prisons (FBOP). Intimately familiar with the symbolic quality of health care provided, I lived the rationing of health care practiced by FBOP medical personnel, and saw the organized denial of medical care to wards of the FBOP. Medical care within the FBOP is symbolic, with minimal expectation of improving prisoners' health. Discretionary medicine is top-down FBOP policy. The symbolic health care(less) provided by the FBOP is the focus of the present article.

© 2005 Californian Journal of Health Promotion. All rights reserved.
*Keywords: Federal Bureau of Prisons, prison health care, deliberate indifference*

## Introduction

Are prisoners' rights to medical care, such as those afforded under the Eighth Amendment that bans cruel and unusual punishment, being met? Are rights provided by the due process clauses of the Fifth and Fourteenth Amendments being upheld? Are standards of health care established by Congressional mandate, Supreme Court rulings, and policy directives contained in the U.S. Department of Justice Health Services Manual, being met by the Federal Bureau of Prisons (FBOP) health care delivery system?

Issues discussed are based upon the author's personal experience(s) while imprisoned in two Federal Medical Centers (FMC) of the FBOP; interviews conducted with prisoners over a five-year term of imprisonment; interviews with prisoners during and since release; academic training garnered through completion of Ph.D. post-release; and an in-depth analysis of medical directives including: Federal Bureau of Prisons policy statements, United States Department of Justice (DOJ) Policy Statements and statistics, United States General Accounting Office reports, and information provided by the American Correctional Association. Prison policy statements delineate health care mandates while ethnographic data describe the reality of health care(less) provided.

## Methodology

As a Convict Criminologist (an ex-prisoner who has academic training), I had the opportunity to analyze prison culture from the perspectives of participant and observer. Caged within the razor-wire of federal prison, I witnessed and chronicled significant deprivations of "normal" life inherent in the warehousing of human beings - "The Society of Captives" (Sykes, 1958). Elements of prison life researched include: the health care delivery system, the economic system of the imprisoned, process of spoiled identity, and prison as the university of crime. The methodology implemented includes identifying variables of interest, bringing the topic to life through qualitative (ethnographic) research, and comparing observations and interview notes with discussion and descriptions contained in social theory (Cressey, 1963; Irwin, 1970, 1980, 1985, 2005; Morton, 2006; Richards, 1995, 1997; Richards & Jones, 1997). The following focuses upon the crisis known as health care in the FBOP.

## The Right to Timely and Adequate Medical Care

Does a prisoner confined in the FBOP have the right to timely and adequate medical care? While it is true that prisoners lose many of the rights they previously enjoyed prior to incarceration, "the one right that they do retain,

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

under the Eighth Amendment, is the right to be protected against cruel and unusual punishment (*Bell v. Wolfish*, 1979)." "There is no iron curtain drawn between the Constitution and the prisons of this Country (*Wolf v. McDonnell*, 1974)."

In 1972, a United States District Court ruled that the Alabama correctional system violated inmates' rights under the Eighth and Fourteenth Amendments by not providing "adequate" and "sufficient" medical care for prisoners (*Neuman v. Alabama*, 1974). In *Estelle v. Gamble* (1976), the United States Supreme Court ruled that "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture of a lingering death." In *Gregg v. Georgia* (1976), the United States Supreme Court ruled that "[the] infliction of such unnecessary suffering [is] inconsistent with contemporary standards of decency."

*Estelle v. Gamble*, supra, sets forth the "deliberate indifference standard to serious medical need" as the measure to determine whether or not a state [FBOP] has breached its constitutional duty to provide medical care. McLaren (1997, pp. 369-371) observes that, "It was established in *Gamble*, deliberate indifference to serious medical needs of prisoner's constitutes unnecessary and wanton infliction of pain." The court held "[d]eliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment" (*Gamble*, supra).

Courts have defined serious medical need as "a condition diagnosed as requiring medical treatment or one for which the need for medical treatment would be obvious even to a layperson" (*Hampton v. Holmesburg Prison Officials*, 1976; 1977). "[H]ighly contagious or dangerous conditions for which treatment is mandated by statute" (*French v. Owens*, 1982). "[C]onditions diagnosed as serious and that threaten substantial harm if not treated or that may result in serious injury when requests for treatment are denied" (*Freeman v. Lockhart*, 1974).

"[I]njuries that are severe and obvious" (*Smith v. Sullivan*, 1977). "[C]hronic disabilities and afflictions" (*Barksdale v. King*, 1983).

The Supreme Court, in *De Shaney v. Winnebago County Social Services* (1989), recognized the total dependence of prisoners upon the prison agency for health care and safe conditions of confinement. Justice William Renquist clearly enunciated the obligations of prison custodians, stating:

> "[W]hen the State [FBOP] takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being... The rationale for this principle is simple enough: when the State [FBOP] by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- e. g. food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on State [Federal] action set by the Eighth Amendment. . ."

The prisoner is unable to get a second opinion. Life or death of those imprisoned is dependent upon the medical care provided by the FBOP.

Whereas legal precedent applies equally to men and women prisoners, *Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia* (1994), addressed prison conditions specific to female prisoners. In this case the court found Eighth Amendment violations due to lack of medical care, sexual harassment, and inferior living conditions.

> "After an extensive trial, the court concluded that civil rights violations were established conclusively by the plaintiffs and that prison officials had deviated from the standard of acceptable mental health care for women prisoners, had tolerated deficient gynecological examinations and testing, and had maintained inadequate testing for sexually transmitted diseases. The court,

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

applying the 'deliberate indifference' standard [Estelle v. Gamble (1976)], further found liability for inadequate health education, prenatal care, ineffective prenatal education, and overall inadequate prenatal protocol. In a scathing portion of the opinion, the judge found that shackling of female prisoners in the third trimester of pregnancy and immediately after childbirth violated contemporary standards of decency. The belief that adequate medical care exists in women's prisons may be on the brink of serious reexamination in light of the revelations of facts in this case (McLaren, 1997, pp. 369-371)."

The medical needs of women in prison must be provided for at acceptable community standards (see Palmer, 1994; Pollock-Byrne, 1990; U.S. Department of Justice [DOJ]; 1997). The hard reality is that they are not being met.

**U.S. Department of Justice Policy Statements: Medical Care in the FBOP**
On March 26, 2005, the Federal Bureau of Prisons made "available information to help meet the requirements of the Correctional Officers Health and Safety Act of 1998 which requires that the Attorney General and the Secretary of Health and Human Services provide guidelines for infectious disease prevention and detection, and treatment of inmates and correctional employees who face exposure to infectious diseases in correctional facilities. Clinical guidelines are being made available to the public for informational purposes only. The FBOP does not make any promise or warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof" (Federal Cure, 2005). Please note how the FBOP delineates symbolic medical care through obfuscation: "for informational purposes only... The FBOP does not make any promise or warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof." These are the smoke-and-mirror tactics implemented by the FBOP to distort the reality of medical care available within the Federal Prison system.

In theory, directives contained in FBOP prisoner health care policy statement, as delineated in the U. S. DOJ Health Services Manual (1997), "appear" to meet the required level of humane treatment. Federal directive and Supreme Court rulings mandate provision of necessary medical care at levels comparable to accepted community standards. DOJ rules state that health care requirements take precedent over security concerns "whenever possible." It appears FBOP health care directive (U.S. DOJ, 1997) assures humane treatment of prisoners, yet the author suggests that the reality of health care in the FBOP is symbolic in nature. Symbolic medical care is a common theme among prisoners interviewed:

> "These people don't give a rat's ass about you. They don't care if you're sick or dying. This so called medical care ain't nothin but a big show. These doctors, hell most of em ain't even doctors, fill out their little forms so they can say they're doin somethin for ya. They ain't. They don't care if you live or die. It's all just a show for the public."

Health care services provided by the FBOP are symbolic in that they are predicated upon a system of economic justification, rather than motivated by need to provide adequate medical care. A prisoner described the reality as: "It is all just a show for the public, a bureaucratic paper trail to justify fiscal expenses. It is the sick and dying prisoners who pay the price, very often the ultimate price: death."

FBOP health care policy portends to provide medical care "consistent with acceptable community standards." Section 1 of the DOJ (1997) FBOP Health Services Manual Mission Statement issues the following mandate:

> "The health care mission of the Federal Bureau of Prisons is to provide necessary medical, dental, and mental health services to inmates by professional staff, consistent with acceptable community standards." (p. 1)

The stated function of FBOP health care policy is to provide humane medical treatment for

prisoners. When compared to the actual quality of medical services provided, health care in the FBOP is symbolic by design. In reality, health care does not meet the standards delineated in the DOJ policy statements. The vast divide between stated health care policy and the reality of health care provided by the FBOP, contravenes both Supreme Court rulings and Congressional mandate.

The FBOP medical care mission statement states that "health care requirements take primacy over security concerns whenever possible." This is patently false rhetoric. Greenberg (1988, pp. 167-170) discusses the contradiction between the goals of FBOP health care requirements and security concerns: "the stated health care policy of the FBOP gives precedent to medical care over security requirements whenever possible. In reality, the converse is true" (see Anno, 1991). The normative expectation of adequate health care in the prison setting is diametrically opposed to the security function of the FBOP. Citing the possibility of "an incompatibility between medical and correctional guidelines [that] should be resolved, as far as practical, in favor of medicine," the FBOP presents a front that health care requirements take precedent over security concerns. The phrase "as far as practical" is an open-ended ambiguous definition allowing the FBOP free hand justification, which places security concerns over prisoner's health care needs. This is an excellent example of conflict theory which maintains that those in power (in this case the FBOP) make the rules to benefit themselves at the expense of prisoners in their charge.

An inherent problem in the DOJ Health Services Manual (1997) that delineates policy directives contained in the FBOP Health Services Manual Mission Statement, is the definition of "acceptable community standards." Fleisher and Rison (1997, p. 329) question "what do the terms 'adequate,' 'reasonable,' 'appropriate,' and 'acceptable' mean for prison officials who must design and deliver inmate medical care?" Definitional ambiguity allows the FBOP free reign to contravene legal obligations contained in the U.S Constitution, Congressional mandates, Supreme Court rulings, and DOJ policy statements. The FBOP puts forth, for public consumption, an image of compassionate health care for those under its charge. Yet within the context of definitional confusion, the FBOP minimizes and skirts Constitutional, Supreme Court, and Congressional mandate.

**Symbolic Medical Care**

Today the Federal Bureau of Prisons operates a symbolic medical care system. It is out of legal compulsion, not the welfare of prisoners, that limited medical care is rationed. On February 10, 1994, the United States General Accounting Office (GAO) submitted a report entitled "Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited by Lack of Clinical Staff." The report was submitted to the Subcommittee on Intellectual Property and Judicial Administration, the Committee on the Judiciary, and the House of Representatives. The GAO (1994) provided an assessment of the quality of medical care provided by FBOP physician assistants:

> "Many physician assistants in BOP lack generally required education and certification and are not receiving adequate supervision from physicians. At the three centers we visited, 11 of 27 physician assistants had neither graduated from a program approved by the American Medical Association nor obtained certification from the National Commission on Certification of Physician Assistants." (p. 11)

The General Accounting Office (1994) assessment of medical care provided by the FBOP describes the inadequate health care available to federal prisoners:

> "Inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care they needed at the three medical referral centers we visited [Butner, North Carolina; Lexington, Kentucky; Springfield, Missouri]. This situation was occurring because there were insufficient numbers of physicians and nursing staff to perform required clinical and other related tasks. For example, physicians did not

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

always have enough time to supervise physician assistants who provided the bulk of the primary care given to inmates, and nurses did not have sufficient time to provide individual and group counseling to psychiatric patients. As a result, some patients' conditions were not improving and others were at risk of serious deterioration." (p. 2)

Insufficient medical care staff is a function of dual realities -an exploding prison population in conjunction with proportionately decreasing funds available for health care services.

Fleisher and Rison (1997, pp. 327-334) note that for the fortunate few, some sick and dying prisoners are sent to "contract medical facilities." The fortunate prisoner may receive an operation, or treatment for serious medical conditions at a local contract hospital (public hospitals the FBOP sends prisoners to receive medical care beyond the scope of services the FBOP is able to provided), only to be returned to the "total institution of prison" (Goffman, 1961) and be treated with neglect. I knew prisoners who received adequate medical attention at a contract medical facility only to be returned to prison and die under lock and key because adequate health care was not maintained. The author suggests, and documents, that post-operative care in the prison setting is at best substandard, and that ongoing care for serious medical conditions falls well below the level of acceptable community standards.

Perhaps our society rationalizes the lack of proper medical care provided to those imprisoned because, after all, the prisoner can be viewed as somewhat less of a human being. It is society that attaches the label "prisoner," while sublimating the human being. Berkman reported:

> "The buildup in the prison population has been accompanied by a systematic campaign to dehumanize those in prison. Politicians and policymakers increasingly use terminology such as 'animals' and 'sub-humans' to describe street criminals. The intended result is to demonize those in prison, implicitly relieving society of any obligation to supply decent living conditions or medical care." (pp. 1616-18)

The dehumanization process allows the FBOP symbolic presentation of health care to go unquestioned. Dehumanizing justifies substandard treatment. Substandard treatment is cost effective. Reducing expenditures on medical care frees more resources for human warehousing -- and the cycle of inhumanity disgracefully rages on.

**Reality of Medical Care at Federal Medical Centers: Voices From Within**
Many prisoners entering the federal prison system suffer from malnutrition and disease stemming from poverty, alcohol or drug abuse, poor medical care, risky lifestyles, and the incessant demands of life on the streets. Many have contracted diseases such as HIV/AIDS, TB, hepatitis, and cirrhosis of the liver. The compromised health of many of those entering prison poses a serious challenge to the health care delivery system of the FBOP. What is the response by the FBOP to the medical needs of those entering prison, and what is the long range plan for medical care of prisoners incarcerated with sentences that span decades? How do FBOP health care workers determine who needs and/or receives medical attention? By comparing FBOP policy statements, which in theory govern medical care practices, to testimonies of those imprisoned, insight may be gained from these questions.

Excerpts from interviews conducted with prisoners housed in four FBOP Federal Medical Centers (FMC Rochester, FMC Carville, FMC Lexington, and FMC Fort Worth) follow. This section is intended to replace the myth that those incarcerated are nothing but a bunch of tough guys with tattoos lifting weights. They are people, thousands of them, sick and dying in indignation.

A prisoner interviewed described being poor and using drugs beginning at an early age. He is a black man from the ghettos of Washington, D.C. He spent four years, between the ages of two and six, in and out of hospitals receiving skin

D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37

grafts for burns that resulted when a babysitter placed him in a bath of scalding water. At the time of this interview the individual was 38 and had been locked-up since he was 21 years old:

> "The first time I got loaded-up (high on drugs), God damn, I was 12 or 13 and living in a foster home. I done some crazy shit and now my body's paying the price. Now I just want to be a peaceful old man."

This is just one example of thousands that illustrates the compromised health and the pre-existing conditions with which many suffer as they enter prison. Pre-existing conditions, many predicated upon risky behaviors on the street, pose a serious challenge for the FBOP.

Many prisoners in the FBOP have a history of drug and alcohol abuse. One such prisoner was remanded to a FMC for alleged mental health counseling and alcohol/drug abuse treatment. He describes his condition at the time of incarceration:

> "When I first got to prison I had the DT's-shaking, paranoid, frantic. I could not stand to have nobody touch me or talk to me. The first year was really rough because of the alcohol. Before coming to prison I was doing at least a 6-pack of beer every night after work, and two cases on the weekends."

Many enter prison with severe drug/alcohol addictions. While in the county jail awaiting transport to a federal medical facility I saw a fellow prisoner who was a 25-year old heroin addict. They confined this person, who had become addicted to heroin while serving his country in the Vietnam War, in a cell to dry out cold turkey. I observed the horror of someone suffering withdrawal without medical assistance. I will never forget watching this man pace in circles sweating profusely and shivering at the same time, as he described the sensation of a snake trying to crawl out of his belly and up his throat.

**Politically Rationed Health Care in the FBOP**
Is the delivery of medical care within the FBOP politically rationed? Is someone who complains -- desperately attempting to receive medical care -- subject to retaliatory denial of such care? A prisoner who was having difficulty urinating described the politics of health care within the FBOP:

> "Navy doctors are politically inclined to go along with the system. [In referencing "Navy doctors" the respondent is referring to the government branch of Public Health Services (PHS). These medical technicians support the FBOP medical staff. They wear uniforms similar to those of Naval officers]. A lot of politics involved in getting medical procedures. They look at the background, your PSI [pre-sentence investigation report] and your team reports [evaluations prepared by a prisoner's councilor and unit representative]. This decides what medical procedures you get. Two men died this week. If you don't know somebody on the outside who can step on their feet, the BOP doctors feet, then they just give you a aspirin and forget you."

Another prisoner supports this position stating "If you get injured, hurt, or sick, they give you aspirin, aspirin. It takes months before you get medical attention."

I personally experienced the political rationing of medical care by the FBOP. Becoming very ill while imprisoned, my weight dropped from 214 to 157 pounds, pleading with FBOP doctors for medical care, I was told I was suffering the shock of adjusting to prison (which they had conveniently called post traumatic stress disorder) (see Murphy, 2004). I was passing blood via ten to 14 bowel movements per day. In desperation, I contacted my family who convinced a Senator to contact the Federal Medical Center (prison) on my behalf. In short order I was taken to a contract hospital and diagnosed with Crohn's Disease (ulceration's of the intestine). This disease is chronic, and if untreated potentially terminal (my eldest sister died of Crohn's Disease in 2003). I was one of the lucky few, for in prison, resources needed to mobilize political pressure are rare.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

The symbolic nature of medical care within the FBOP is not provided out of compassion, but rather due to legal compulsion. The FBOP is rationing medical care. A prisoner described the quality of the medical care to which he was subjected:

> "In this system, medical attention is deliberate indifference. This Federal Medical Center is not a real medical facility. There are over 150 men in wheelchairs. There are maybe 50 men in wheelchairs on the third floor of my unit, and there's only one elevator. If there is a fire, we're all toast (see Caroit (2005) "133 Killed in Dominican Republic Prison Fire"). This place has no handicapped bathrooms or showers. Men are always falling out of their wheelchairs on the steep ramps."

Description of the inhumane medical care provided by the FBOP is echoed by another prisoner:

> "If you come here in a bad medical state, you go out in a black bag with a tag on your toe. Critical care cases are supposed to go to a different FMC. Yet there are people here with AIDS, cancer, liver disease, TB, and so on. I'd say 70 percent of the prisoners here are on respite [medically unassigned]. They don't have the facilities to care for these men. In the health care unit much of the care is provided by ICP's [inmate care providers]. These are inmates who have received very little training. They are given a fancy diploma that don't mean nothin'."

Based upon my personal experience, the (symbolic) medical care provided by the FBOP does not rise to the level of accepted community standards as required by law. For many imprisoned, their original sentence has been convoluted into a death sentence due to substandard health care.

It is easier for the average citizen to believe that prisoners are treated with compassion rather than come to understand the true nature of medical care provided by the FBOP. The following excerpt gives insight into the quality of medical care provided those incarcerated. The prisoner interviewed was in a wheelchair. He was wearing a pair of shorts that did not fit, and a T-shirt. He was not wearing shoes. His feet were bleeding. An uncomfortable wardrobe was the least of his problems.

> "I been here a year and because of my large size, I have yet to get clothes, or even underwear. I been sick here twenty times. I came here from a hospital on the streets where I was suffering heart failure. Since I have come here I have had to buy antibiotics and painkillers from other inmates because the prison doctor won't give me any. Recently I woke up about 1:00 A.M. with congested heart failure. The emergency button in the medical wards don't work. I couldn't breathe, my temperature was up, and I was foaming at the mouth. My roommate in the medical-acute dorm, which has 25 men suffering with MS [multiple sclerosis], MD [muscular dystrophy], and so on, and everybody is in a wheelchair, he called the cop. The CO [prison guard] called the nurse. The nurse refused to come check my condition. The CO said she can't do anything for me."

Conflicting with the medical needs of prisoners are the security requirements of the FBOP. Fleisher and Rison (1997, p. 323) outline this dilemma, "Security is a primary concern in corrections, even during the delivery of medical care to inmates" (see Anno,1991; Greenberg,1988). However, The FBOP medical care mission statement delineates that health care requirements take primacy over security concerns -"whenever possible." The conflicting dualism of security versus health care was underscored in an interview with a prisoner I knew very well. He was taken to a contract hospital for a five-way heart bypass:

> "I'm in the operating room, already prep'ed for surgery. The HACK [prisoner argot for prison guard: hopeless asshole carrying keys (Murphy, 2004)] had me handcuffed to the operating table. I couldn't believe it, but this HACK was going to stay in the operating room for the whole operation. The doctor

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

comes in and tells the HACK to take the cuffs off. The HACK refused and said something about security requirements. The doctor explained to this lard head that in addition to being under anesthesia, he was going to cut apart my ribcage and remove my heart from my body. He explained that it was pretty much clear that I wasn't going nowhere. The fucking HACK still refused to take off the cuffs. Now the doctor got pissed. He told the HACK that if my heart stopped and they had to hit me with the paddles, the cuffs would conduct electricity and I'd get severely burned. The HACK told the doctor that if that were the case, I'd just have to get burned. The doctor went ballistic. He called the warden right from the operating room. I told the doctor that I refuse the operation, and that I was going to sue these bastards. After a shouting match with the warden, the doctor handed the phone to the HACK. Next I knew the cuffs were off and the operation was on."

The length to which the FBOP goes to ensure security in the face of medical need is amazing. I interviewed a prisoner who is a quadriplegic. He is paralyzed from the neck down and confined to a wheelchair. He had made great progress by the time I interviewed him, training his diaphragm to drive the breathing process, for previously he was bound to a mechanical respirator (similar to Christopher Reeves). I recount the events described by the prisoner:

"These assholes are totally unbelievable. I have been paralyzed for over a decade and these fucker's still chain me to my chair [wheel chair] when I go out on medical [a trip to a medical contract facility]. I got shot and my fucking spinal cord was busted up. What do these assholes figure, I'm going to escape, I'm going to run the 440, or do these stupid assholes figure I'm goin' to fly away? And they put me through this shit every time. The good news is that the doctors at the hospital make these fucking assholes take the chains off as soon as we show up.

The functional conflict between the medical needs of a prisoner and the security emphasis of the FBOP is further underscored by an ex-con who is a medical doctor. Berkman's (1995) analysis appeared in the American Journal of Public Health:

Beneath the talk of health care systems and public health planning, there is the stark reality of individuals grappling with illness and possible death in an inhumane environment. During my second bout with cancer, I was almost totally paralyzed from the neck down, able only to breathe and minimally use my hands. Yet, I was kept shackled to the bed, the guard coming by regularly to check the restraints. Prisoners struggle to live, or die, surrounded by people whose primary responsibility is to confine them, not care for them. There is no comforting touch, no human solidarity in the face of suffering or death." (pp. 1616-1618)

Section 1 of the U.S. Department of Justice (1997:2) Health Services Manual Mission Statement decrees the level of health care provided prisoners must be "consistent with acceptable community standards." Is a system of health care in which people are struggling to live or die, surrounded by people whose primary responsibility is to confine them, not care for them, consistent with acceptable community standards? Is the FBOP meeting the standards of care ordered by the Supreme Court? Has contemporary philosophy of "throw away the key" usurped the Eighth Amendment guarantee against cruel and unusual punishment? Are prisoner's human beings, subhuman, or just a number?

**Voices From Within: Media Accounts**
A staff article in the Miami Herald, citing an Associated Press release (2005), describes the horrific conditions pregnant women face while incarcerated. "A former inmate is suing over the death of her baby, born over a cell toilet even though she complained of labor pains for nearly 12 hours. The mother was leaking amniotic fluid, running a fever, had complained for nearly 12 hours about labor pains, and had asked repeatedly to be taken to a hospital before the March 5th birth. 'What she went through no one

should have to go through,'" stated the women's attorney.

Those facing complicated medical issues may receive a minor sentence, which may be convoluted into a death sentence due to medical neglect. Cauvin (2005) described the tragic circumstances surrounding the death of a quadriplegic sentenced to ten days of jail confinement for possession of marijuana used for medicinal purposes. Due to complications the defendant was taken to a contract hospital (because his place of confinement could not meet his medical needs) on the first day of his incarceration. Five days later the defendant died. The inquiry into the matter revealed that the defendant was "susceptible to swift deterioration requiring acute- care hospitalization." Should our civilized society take solace in the fact that it was determined this individual required special care, only after his death?

von Zeilbauer & Plambeck (2005) reported that a former nuclear scientist convicted of taking skis from his ex-wife's house died on the tenth day of confinement. He suffered Parkinson's disease, yet "the medical director had cut off all but a few of the 32 pills he needed each day to quell his tremors. . . Over the next 10 days he slid into a stupor, soaked in his own sweat and urine... But he never saw the doctor again and the nurses dismissed him as a faker" (p. 1). No matter the judicial intention, does this deliberate indifference not boil down to a death sentence?

**Prison Population Explosion: Strains on FBOP Health**
Due to rapid growth of the prison population, health care for those incarcerated in the FBOP is compromised. Presently, the United States incarcerates the highest percentage of its citizenry, as well as the highest raw number of individual citizens among all industrialized nations of the world (Walmsley, 2003). Presently, there are in excess of 2.1 million people confined in U.S. prisons (Harrison & Beck, 2005). It is estimated that in the year 2005 at least 640,000 prisoners will return to "our" communities (The Sentencing Project, 2004) bringing with them the ravages resultant of denied medical care.

A result of the upsurge in human warehousing is "selective incapacitation" (the theory that removing offenders from society will reduce crime: utilitarian philosophy), and "presumptive or prescriptive sentencing guidelines," (incarcerating offenders for multiple decades per offense). Given the contemporary penal philosophy of "throw away the key," the FBOP is forced to provide medical care within a fixed budget, while concomitantly experiencing an exploding population base (Blumstein, Cohen, & Nagin, 1978; Hagan, 1994).

The FBOP espouses practical health care solutions for meeting prisoners' medical needs. Medical care provided by the FBOP is, in part, an economic function of a fixed operating budget, compromised by an increasing prison population. As the Federal prison population continues to skyrocket, limited funds available for health care must be used to treat greater numbers of prisoner's. Also, medical support staff in the FBOP must care for increasing numbers of patients. As case-loads placed upon medical support staff continue to grow, and money available for health care continues to dwindle, the quality of medical care for prisoners proportionately decreases. The "practical" solution for the FBOP symbolic health care delivery system is to reduce health care services.

The real mission of the FBOP is not to medically or otherwise rehabilitate, but to function as a vehicle for extracting punitive retribution. The needs of those imprisoned are secondary to the fiscal bottom line. Fiscal incentive, not humane consideration, is the driving force behind the FBOP health care delivery system.

**Prison: A "Health Maintenance Organization" (HMO)**
Fleisher and Rison (1997, p. 327) observe that the FBOP operates the 'the nation's largest health maintenance organization." Correctional health care delivery systems have been viewed as the original managed care setting, in the sense

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

that there is a fixed budget for the provision of medical care regardless of prison population size. Douglas and Mundey (1995, p. 98-100) argue that "Managed care is a health care delivery system in which costs, accessibility, quality and outcomes of care across a continuum of health services are tightly regulated using various rules, guidelines, and oversight methods." If the segment of the prison population in need of medical care exceeds projection, the FBOP has no alternative than to reduce the quantity and quality of medical services available. Such cutbacks reflect the "practical" application of "symbolic" medical care within the FBOP. In today's policy of human warehousing, fiscal resources are simply not available to meet health care needs.

Ballooning health care costs are a dilemma shared by both the public and private sectors. However, the precipitous increase in the prison population is a function of Congressional policy -"throw away the key." Due to the politically engineered prison population explosion, the health care delivery system of the FBOP has been forced to ration medical care and reduce the quality of health care provided. Crawford and Moses (1995) reported:

> "Private insurers fiercely defend the need to control their risk; 'correctional insurers,' on the other hand, must deal with 'mandatory enrollment.' Correctional institutions cannot limit the number of patients they will insure. This inability to control assumed risk is further exacerbated by a number of institutional conditions: an increase in time served, the increased violence of some segments of the offender population, and the greater prevalence of infectious diseases in crowded facilities." (pp. 120-121)

For a given fiscal year, Congress allocates the FBOP a fixed budget. Funds available for health care are predetermined to accommodate a population of X. However, if the population increases to 2X, the same fiscal budget must accommodate. Yet, the FBOP population has soared from 24,252 in 1980 (FBOP, 2005) to approximately 179,000 prisoners midyear 2004 (Harrison & Beck, 2005). Moreover, the federal prison system's growth has outpaced the state prison growth for the past decade (Harrison & Beck, 2005). In other words, if the FBOP is allocated $100 to care for 100 prisoners over a fiscal year, that breaks down to one dollar per prisoner. If the prison population increases to 200 prisoners over the fiscal year, the same $100 is available, thereby decreasing funding from one dollar per prisoner to 50 cents. Amplifying the situation, there are currently more critically, chronically, and mentally ill prisoners in the FBOP than in any other period in U.S. history (FBOP, 1995). Further, *Corrections Compendium* (1998) reported that 30 percent of the FBOP prisoner population is chronically or critically ill.

**Guerilla Healthcare Techniques: Self-Survival or Die**
While imprisoned, I observed various methods prisoners used to survive, despite limited, rationed, symbolic health care service. These methods of self-preservation are routine behavior patterns prisoners implement to maintain and improve their health. For many, these are self-driven programs embraced in an attempt to stay alive.

Given the lack of adequate medical care provided by the FBOP health care delivery system, four forms of self-maintenance implemented by various prisoners' were identified. These include: the walker, the health-nut, the weight lifter, and the maintenance-man. A fifth approach, the sessile state, is the all too frequent destruction of health that results from the soul-crushing despair of incarceration, in conjunction with inadequate medical care.

**The Walker**
Many of the elderly prisoners are walkers. Their mantra is "move it or lose it." They walk the track several times per day in endless circles going nowhere. Their self-reliance often yields improvements in health. Many of those implementing the walking approach to self-maintenance shed weight. Diabetics interviewed reported their reliance on insulin was reduced. Several indicated their blood pressure was lowered as a result of their walking. An additional benefit to the "walker" is the social

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

and emotional support provided through the interaction with those whom they walk. Many of the prisoners interviewed explained that they had no choice but to walk. In the face of inadequate medical care, many believed if they did not do something for themselves, they were destined to die in prison.

**The Health-Nut**
The health-nut relies on nutrition and vitamins for health maintenance. These prisoners practically exist on fruits and vegetables purchased on the prison's black market. Prison culture has its own economic system. Cigarettes and stamps, available for purchase at the prison commissary, are the usual forms of currency. These staples are used to purchase commodities ranging from legal services provided by a "jail-house attorney," to food stolen from the kitchen. The health-nut shunned the slop passed off as food in the prison chow hall. As of January 1, 1996, on average, the FBOP spent $2.74 on food per prisoner per day. This equates to roughly ninety cents per meal (Camp & Camp, 1996). In spite of the atrocity called food put forth by the FBOP, the culinary cuisine of the health-nut was usually prepared in microwave ovens located in some cell units. I was amazed at the gourmet quality meals many were able to miraculously create with limited supplies available.

**The Weight Lifter**
The weight lifter implements a combination of exercise and self discipline to maintain health. The myth that prisoners are muscle bound weight lifters was not born out in my experience. In fact, the vast majority of those I observed lifting weights were not huge burley men. These were individuals who found disciplined commitment to a structured activity as their mechanism of survival. For many this was a revelation, a life-changing awakening. In their life on the street, many of the prisoners interviewed did not have a firm grasp of what discipline or commitment meant. In the prison setting, these individuals not only used the activity of weight lifting as a method of health maintenance, but found direction through the commitment of training everyday.

Despite the positive gains associated with weight lifting, an understanding of commitment, discipline, and improved health, the FBOP has eliminated weight lifting as a tool for self-improvement. On October 1, 1996, Congress passed the Zimmer Amendment. One feature of this legislation was the prohibition of weight lifting equipment (Zimmer Amendment, 1997).

The Zimmer Amendment was a stopgap measure that expired at the end of the fiscal year, 1997. This legislation was replaced by H.R. 816, the "Federal No Frills Prison Act of 1997" (105 Congress, February 25, 1997). H.R. 816 states in part:

> "No Federal funds may be used to provide any of the following amenities or personal comforts in the Federal prison system: (3) Instruction (whether live of through broadcasts), or training equipment, for boxing, wrestling, judo, karate, or any other martial art, or any bodybuilding or weight lifting equipment, of any sort."

Subsequently the FBOP has adopted practices that reflect the Zimmer Amendment. The October 1, 1997, to September 30, 1998 budget bill H.R. 2267 contains a provision similar to the Zimmer amendment that prohibits the purchase or replacement of weight lifting equipment.

Through legislative action, Congress and the FBOP have taken from the prisoner far more than just weights. Many of those incarcerated had discovered a sense of commitment and discipline through weight lifting. More than physical development, many grew in strength of character. Additionally, weight training was for many a means of improving and maintaining health. It may be argued that a large sum of money was saved in health care expenditure as a result of improved health associated with weight training. Does it not make sense -economic, intellectual, and emotional- to provide those incarcerated with the opportunity to improve their health and grow in character through the disciplined commitment of lifting weights?

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

**The Maintenance-Man**
The maintenance-man implements a rounded approach to personal health care. John Irwin, in his book *The Felon* (1970) describes this rounded approach to surviving in prison as the "gleaner." Irwin states "one very important dimension of this style of adaptation, is the tendency to pick through the prison world (which is mostly chaff) in search of the means of self-improvement" (p. 158) (see Cressy, 1963; Lemert, 1972).

Rather than committing to one of the categories preciously discussed, the maintenance-man borrows a bit from each. He frequently walks. He is concerned with nutrition. He lifts weights, and often engages in aerobic exercise. In addition, the maintenance-man spends time in the library, takes classes, or enrolls in the limited programs provided by the FBOP. Also, the maintenance-man often embraces religious activities. He is a renaissance man, treating not only his physical health, but a rounded approach of body, mind, and soul.

**The Sessile State**
The fifth approach, implemented by so very many prisoners, is antithetical to a positive state of health. In the sessile state, the prisoner seems to grow roots to the seat of a metal folding chair. Stationed in from of a TV, the physiologically beleaguered and often psychologically broken prisoner, wastes away in an endless progression of stagnation. They do not receive adequate medical care, and as a result, their health spirals downward. It is often a slow, agonizing death, which I observed over and over again.

**Conclusion and Recommendations**
Many prisoners are condemned to death due to a lack of fundamental medical care. The FBOP attempts to balance limited funds available for health care services with an exploding prison population. It is Congress who approves or disapproves FBOP funding requests, and it is Congress who has passed the retributive sentencing laws - which created an explosion in the federal prison population. The imbalance between finances available for health care services and the exploding prison population results in the rationing of health care available to the prisoner. Budget constraints are reducing health care services below the cruel and unusual punishment threshold established in the Eighth Amendment. The quality of health care provided in the FBOP does not rise to the level of acceptable community standards. The Draconian sentencing policies of "throw away the key" have created human warehousing heretofore unseen in the first-world nations this century.

As a civilized society, those imprisoned are entitled to humane treatment. By reducing the present rush to punishment, thousands of first time non-violent offenders would be deflected from the prison system. This would stem the tide in the relentless process of prison construction. Refocusing social conscience would greatly reduce budgetary demands on the FBOP (see Pepinsky, 1991; Pepinsky & Quinney, 1991).

Many entering prison come from a background of poverty. By providing prisoners health management training, prison related health care expenses would be reduced. Implementing suggested health care management tools, the health status of the prisoner would improve over the course of incarceration. Upon release, the former prisoner will be better equipped to maintain a healthy life style, and thus a reduction in social costs associated with subsidized health care. Additionally, the implementation of a healthy lifestyle may lead to a reduction in criminal activity and reduce recidivism.

It is imperative that an independent advocate be established to campaign for the health care rights of prisoners. The FBOP has entered into a symbolic process of rationed health care. If a prisoner does not have someone on the outside to fight for medical care on his/her behalf, that individual may be subject to rationed medical care. If an individual is not familiar with how to initiate a court proceeding to force the delivery of health care, that individual may be subject to discretionary care. An independent advocate would facilitate the right to timely and adequate medical care on the prisoner's behalf.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

An area of future research should focus upon the bio-ethical issues associated with inmates being used as "lab rats" within the total institution of prison. Researchers rely upon "informed consent" as an element in meeting the guidelines of institutional review boards. I suggest that research be conducted into the viability of obtaining truly informed consent behind the razor wire of our country. Researchers typically do not live the reality of prison. They do not fully understand that prison is spelled H-E-L-L. They cannot fully comprehend that a prisoner will do virtually anything to leave the hell called prison. In full bold letters the informed consent form may read, in prison argot, "you ain't got nothin' commin'." Researchers typically will not understand that this translates to the prisoner; 'If I do this, I know that agreeing to participate will get me a step or two closer to the gate.' Further, history – the most accurate predictor of future actions – shows that powerless prisoners fall victim to the powerful bureaucracy.

Lastly, further research need be conducted into the application of community corrections. By sentencing first time, non-violent offenders to the "university of crime," our system is producing "damaged goods" (Hochstetler & Murphy, 2004). Our prison system is producing a very dangerous group of "gladiators" who will return to our communities. We need to avoid incarceration whenever possible in order to avoid the deleterious consequences of living the prison experience. Additionally, further research need be conducted in order to measure the positive consequences of keeping first time, non-violent individuals out of prison. Researchers need quantify the positive ramifications of keeping individuals in the community setting, keeping them in close relationships with their partners and children, allowing them the opportunity to find and maintain employment, as well as the opportunity for pursuit of education, and simply avoiding the label and associated stigma of ex-con.

**References**
Anno, J. B. (1991). Analysis of inmate/patient profile data. Washington, DC: Blackstone Associates, Inc.
Associated Press. (2005). Ex-inmate sues over death of baby born over toilet. Retrieved March 1, 2005, from http://www.miami.com/mld/miamiherald/news/state/103891131.htm?1c
Berkman, A. (1995). Prison health: The breaking point. American Journal of Public Health, 85, 1616-18.
Blumstein, A., Cohen, J., & Nagin, D. (1978). Deterrence and incapacitation: Estimating the effects of criminal sanctions on crime rates. Washington, DC: National Academy of Sciences.
Camp, G., & Camp, C. (1996). The corrections yearbook. South Salem, NY: Criminal Justice Institute.
Caroit, J. (2005). Gang fight and fire in overcrowded prison in Dominican Republic kill 133 inmates. The York Times, March 8, Section A, 12.
Cauvin, H. (2005). Report clears D.C. judge of misconduct in inmate's death. Washington Post, March 18, 2005, B05.
Corrections Compendium. (1998). Inmate health care, part II. Corrections Compendium, 23, 17.
Crawford, C. A., & Moses, M. C. (1995). NIJ reports help practitioners through health care maze. Corrections Today, 57, 120-121.
Cressey, D. R. (1963). The prison: Studies in institutional organization and change. New York: Holt, Rinhehart & Winston.
Douglas, T., & Mundey, L. (1995). Making managed care principles work in the correctional setting, Corrections Today, 57, 98-100.
Federal Bureau of Prisons Fact Card. (1995). Washington, DC: U.S. Department of Justice, Federal Bureau of Prisons.
Federal Bureau of Prisons. (2005). About the Federal Bureau of Prisons. Retrieved May 5, 2005, from http://www.bop.gov
Federal Cure. (2005). Federal Bureau of Prisons clinical practice guidelines. Retrieved March 28, 2005, from http://www.FedCure.org

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

Fleisher, M. S., & Rison, R. H. (1997). Health care in the Federal Bureau of Prisons. In J. W. Marquart & J. R. Sorensen (Eds.), Correctional contexts: Contemporary and classical readings (pp. 327-334). Los Angeles: Roxbury.

Goffman, E. (1961). Asylums: Essays on the social situation of mental patients and other inmates. Garden City, NY: Rutgers University Press.

Greenberg, M. (1988). Prison medicine. American Family Physician, 38, 167-170.

Hagan, J. (1994). Crime and disrepute. Thousand Oaks, CA: Pine Forge Press.

Harrison, P. M., & Beck, A. J. (2005). Prisoners at midyear 2004. Washington, DC: Bureau of Justice Statistics.

Hochstetler, A., & Murphy, D. S. (2004). Damaged goods. Crime and Delinquency, 50, 436-457.

Irwin, J. (1970). The felon. Englewood Cliffs, NJ: Prentice Hall.

Irwin, J. (1980). Prisons in turmoil. Boston: Little Brown and Company.

Irwin, J. (1985). The jail. Berkeley, CA: University of California Press.

Irwin, J. (2005).The warehouse prison: Disposal of the new dangerous class. Los Angeles: Roxbury.

Lemert, E. (1972). Human deviance, social problems, and social control. Englewood Cliffs, NJ: Prentice Hall.

McLaren, J. (1997). Prisoners' rights: The pendulum swings. In J. M. Pollock (Ed.), Prisons: Today and tomorrow (pp. 369-371). Gaithersburg, MD: Aspen Publishers.

Miami Herald. (2005). Ex-inmate sues over death of baby born over Tampa jail toilet. Retrieved March 21, 2005, from http://www.miami.com

Morton, J. B. (2006, in press). Implications for corrections of an aging prison population. In R. Tewksbury (Ed.), Behind bars: Readings on prison culture.

Murphy, D. S. (2004). Pre-prison, prison, and post-prison: The link between the pains of imprisonment and onset of post traumatic stress symptoms. (Doctoral dissertation, Iowa State University, 2004).

Palmer, J. W. (1994). Constitutional rights of prisoners. Cincinnati, OH: Anderson.

Pepinsky, H. E. (1991). The geometry of violence and democracy. Bloomington, IN: Indiana University Press.

Pepinsky, H. E., & Quinney. R. (1991). Criminology as peacemaking. Bloomington, IN:Indiana University Press.

Pollock-Bryne, J. M. (1990). Women, prison, and crime. Pacific Grove, CA: Brooks/Cole.

Richards, S. C. (1995). The structure of prison release: An extended case study of prison release, work release, and parole. New York: McGraw Hill.

Richards, S. C. (1998). Critical and radical perspectives on community punishment: Lessons from the darkness. In J. I. Ross (Ed.), Cutting the edge: Current perspectives in radical/critical criminology and criminal justice (pp. 122-144). New York: Praeger.

Richards, S. C., & Jones, R. S. (1997). Perpetual incarceration machine. Journal of Contemporary Criminal Justice, 13, 180-194.

Sykes, G. (1958). Society of captives: Study of maximum security prison. Princeton, NJ: Princeton University Press.

The Sentencing Project. (2004). Research on recidivism and re-entry. Washington, DC: Sentencing Project.

United States Department of Justice. (1997). Health services manual. Washington, DC: United States Department of Justice.

United States General Accounting Office. (1994). Bureau of prisons health care: Inmate's access to health care is limited by lack of clinical staff. Report to the Chairman, Subcommittee on Intellectual Property and Judicial Administration, Committee on the Judiciary, House of Representatives.

von Zielbauer, P., & Plambeck, J. (2005). As health care in jails goes private, 10 days can be a death sentence. New York Times, February 27, Sec. 1, 1.

Walmsley, R. (2003). World prison population list. London, UK: Home Office.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

Author Information
Daniel S. Murphy, Ph.D.
Appalachian State University
E-Mail: murphyds@appstate.edu